UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



MOSHE SMILOWITZ, ABRAHAM DESSER, MINDY
DESSER, RIVKA DESSER, SAMUEL DESSER, ZIRA G.
DESSER, DAVID FRIEDMAN, ESTHER GOLDBERG, MEIR
GOLDBERG, MENACHEM GOLDBERG, ZVI GOLDBERG,
LIPA GOLDSTEIN, HERSHEL GREEN, ABRAHAM
GREENFIELD, HENDEL GREENFIELD, ARON KARPEN,
BERL KARPEN, ESTHER KARPEN, FEIGY KARPEN, PEARL
KARPEN, RACHEL KARPEN, SHEMAYA KARPEN, ISAAC
KOHN, YAACOV M. SEBBAG, BORECH STEIN, SHEINDEL
STEIN, and JOSEPH S. WASSERMAN, on behalf of themselves
and others similarly situated,

                        Plaintiffs,

            -against-

THE SULLIVAN COUNTY BOARD OF ELECTIONS,
ANN PRUSINSKI, and RODNEY GAEBEL, individually and
in their official capacities,

                        Defendants.

**CLASS ACTION
COMPLAINT AND
DEMAND FOR
JURY TRIAL**

**Index No.**

## INTRODUCTION

1.      Plaintiffs are Hasidic Jewish voters who have commenced this action, on behalf

of themselves and others similar situated, to stop the Sullivan County Board of Elections and its

Commissioners (collectively, the "Board" or the "BOE") from engaging in an unyielding

discriminatory campaign to deprive Hasidic Jewish residents of Bloomingburg, New York ("the

Village" or "Bloomingburg") of the fundamental right to vote.

2.      On January 16, 2015, the Board provided notices to 184 registered voters that it

intended to cancel their voter registration and to deprive them of the right to vote.  Of those 184

voters, more than 160 were Hasidic Jews. Despite the fact that all of them had previously registered to vote in Bloomingburg, which is in Sullivan County, the Board purported to require those voters to come forward once again and provide new evidence to demonstrate "why your registration should not be cancelled." While this targeted request was unconstitutional on its face, Plaintiffs and other Hasidic Jews nonetheless came forward and attested to their residency. But this process was a farce. On February 27, 2015, the BOE issued a blanket notice stating that it would cancel 156 of the 184 voters' registrations. The BOE provided no reasoned or individualized explanation for this decision to deprive those 156 residents of their fundamental constitutional rights.

3.      These are extraordinarily irregular and obviously discriminatory actions. There is no other instance in New York State, or in recent memory anywhere else, where a board of elections has sought to cancel the registrations of a subset of voters who appeared in person to vouch for their residency and who in fact had voted in recent elections. The BOE proffered no competent basis for questioning these voters' residences. To target a hand-selected group of voters and to impose on them the burden and expense of proving their right to vote is itself improper. But what makes the action even more egregious here is that *the Board of Elections has sought to cancel the votes of virtually every Hasidic Jewish resident of Bloomingburg.* The Board plainly singled out these voters for challenge based entirely upon their religion.

4.      As the Court is aware, the Hasidic community in Bloomingburg and the adjoining Town of Mamakating is currently under assault by local officials. An aggressive and vocal group of anti-Hasidic residents, who call themselves the "Rural Community Coalition" (the "RCC"), have taken control of municipal governments and have sought to use governmental power to intimidate, slow, and rollback Hasidic migration to the area. The litany of abuses

2

perpetrated by these government actors is currently the subject of litigation before this Court. *See* Amended Complaint (Dkt. No. 43), *Bloomingburg Jewish Educational Center v. Village of Bloomingburg, NY*, No. 7:14-cv-07250-KBF (S.D.N.Y. Nov. 26, 2014).

5.      In support of this discriminatory conspiracy, Bloomingburg and Mamakating officials, with support from the RCC, recently and urgently sought to dissolve Bloomingburg, a village that has existed for 182 years, since Andrew Jackson was President.  The RCC and its political allies believe that if Bloomingburg is dissolved, then they may be able to renege on the Village's prior land-use approvals and prevent the growing Hasidic population, together with non-Hasidic allies, from ever building a majority voting coalition.  Accordingly, Bloomingburg and Mamakating officials organized a petition calling for a special election to dissolve the Village.  The vote was scheduled for September 30, 2014, during the Jewish High Holy Days.

6.      Days before the election, the RCC challenged 194 registered voters, 183 of who were Hasidic or Orthodox Jews.   The New York Supreme Court, acting on an emergency application, ordered that all votes in that election be accompanied by sworn statements attesting to the voter's residence.  Following the election, the court directed that the 69 challenged voters who had voted in the special election should have their votes sequestered pending the Sullivan County BOE's determination of the challenges.  *See* September 29, 2014 Order, *Francis v. Prusinski*, No. 2014-2294 (N.Y. Sup. Ct. Sullivan Cty.).

7.      The Board is controlled by officials who support the discriminatory efforts of the RCC and Mamakating and Bloomingburg officials.  In November 2014, the Board upheld nearly all of the RCC's challenges and declared that 63 of the 69 challenged votes cast during the September election should not be counted.  The Board described itself as "confronted with an apparently mobile population," refused to count the votes of Hasidic students because their

religious school lacked "accreditation," and opined that it would disregard the County Sheriff's interviews with voters at their homes, absent separate proof that "the challenged voter has met the minimum residency requirement." In addition to basing its decision on arbitrary and discriminatory reasons, the BOE lacked any authority to cancel those votes in the first place. Under well-established New York law, a board of elections must count challenged votes that come from registered voters who appear at the polls and swear to their residency. As a result, the New York court annulled the BOE's action, and ordered that the 69 votes be counted. The dissolution referendum was narrowly defeated. *See* Dec. 27, 2014 Order, *Matter of Berger v. Prusinski,* No. 2716-2014 (N.Y. Sup. Ct. Sullivan Cty.).

8.      Unchastened by the state court's rebuke of its actions in connection with the September 2014 election, the Board has renewed its efforts to disenfranchise Hasidic voters. On March 18, 2015, the Village of Bloomingburg will hold an election for one of the three trustee positions on the Bloomingburg board. The RCC, the BOE, and Bloomingburg's incumbents are determined to prevent any fair election that could undermine their control of the Village.

9.      To that end, the BOE recently sent notices to virtually every single Hasidic voter in Bloomingburg, expressing its intent to cancel their registrations, and imposing upon them the burden of appearing at two midweek hearing dates or providing additional documentary evidence or else forfeit their registrations. The BOE's effort to impose upon lawfully registered voters the burden of proving their right to vote was plainly unconstitutional. Indeed, over the past several years, federal courts have sharply divided over whether a state unconstitutionally burdens the right to vote by simply requiring voters to present photo identification at the polls. *See, e.g., Veasey v. Perry*, No. 13-CV-00193, 2014 WL 5090258, at *37 (S.D. Tex. Oct. 9, 2014); *Frank v. Walker*, No. 11-CV-01128, 2014 WL 1775432 (E.D. Wis. Apr. 29, 2014), *rev'd*, 768 F.3d 744

(7th Cir. 2014). Here, the BOE has established obstacles to voting that are far more burdensome than those imposed by a photo identification requirement.

10.     The BOE knew that these Hasidic voters had lawfully registered in Bloomingburg, that they had voted in recent elections, that they had attested to their residence under penalty of perjury, and in many cases, that the County Sheriff had recently confirmed their residences. Nonetheless, it imposed upon them the burden of coming forward with additional written or testimonial evidence, at their own time and expense, or else forfeit their fundamental rights as U.S. citizens to vote.

11.     Despite the fact that the BOE could not constitutionally impose any such burdens, Plaintiffs in fact responded to these threatening notices by presenting substantial evidence of their residency. Plaintiffs reside in Bloomingburg, they have registered there, and it is their constitutional right to vote there. The challenged voters completed the BOE's questionnaires, attested to their residency in Bloomingburg under penalty of perjury, and submitted substantial documentation evidencing that fact. Many also appeared in person to attest to the fact that they and their relatives were in fact registered voters.

12.     At those hearings, the BOE Commissioners did not ask a single question to the challenged voters who appeared, nor did they present any evidence then or thereafter to suggest that any challenged voter was improperly registered in Bloomingburg. Nonetheless, and in spite of the unrebutted evidence of these voters' residences, the BOE took the unprecedented action of cancelling 156 of the 184 challenged registrations, including those of the 27 named Plaintiffs here. The Board provided no reasoned explanation for why it took some voters off the rolls but left others in place. There is no lawful basis for such cancellations under the U.S. Constitution or under the laws of the State of New York.

13.     The BOE has already caused substantial injury to Plaintiffs. They have imposed upon Plaintiffs the time and economic cost of participating in unlawful and biased court proceedings, and they have deprived Plaintiffs of their fundamental rights to vote. The BOE's actions also have required the expenditure of substantial legal fees both in connection with multiple state court actions and now this federal case.

14.     In addition, the BOE has given Plaintiffs every reason to believe that no matter what happens with the March 2015 election, the matter will not end there. Rather, the BOE will continue its effort to harass, intimidate, and challenge voters with each successive election, unless or until stopped by this Court. Indeed, separate from its recent action, the BOE took the highly irregular step of mailing to Hasidic Jewish voters "Confirmation Cards," which seek to impose additional burdens on those voters, and to manufacture additional evidence for future efforts to cancel registered voters before future elections.

15.     Right before filing this suit, Plaintiffs learned of still more challenges that will no doubt invite additional harassment and unlawful conduct. On March 2, 2015, individuals affiliated with the RCC filed another wave of challenges to Hasidic Jewish voters, seeking to purge from the rolls the handful of voters whom the BOE had allowed to remain on the rolls. The RCC's new action will no doubt trigger additional administrative proceedings and additional unconstitutional burdens on other members of the Hasidic Jewish community.

16.     The Board's outrageous and illegal actions are part and parcel of a broader conspiracy to discourage Hasidic Jews from moving to and living in Bloomingburg and Mamakating. These actions reflect nothing more, and nothing less, than an effort to deprive Plaintiffs of the right to vote because of their ethnicity and their religious practices. As the Supreme Court has repeatedly confirmed, the U.S. Constitution protects the right to vote against

arbitrary efforts at disenfranchisement. *See, e.g., Bush v. Gore*, 531 U.S. 98, 104-05 (2000) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."); *Harper v. Va. State Bd. of Elections,* 383 U.S. 663, 665 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment"); *Reynolds* v. *Sims*, 377 U.S. 533, 555 (1964) ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

17.     The Fourteenth Amendment further bars the States from imposing burdens on the basis of invidious religious discrimination. *See, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) (prohibiting government action that "discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons").     The fact that nearly all of those whom the Board has targeted for cancellation are Jewish speaks for itself. *See Yick Wo v. Hopkins*, 118 U.S. 356 (1886).

18.     Accordingly, Plaintiffs have brought this action pursuant to 42 U.S.C. § 1983 and the Voting Rights Act of 1965 to recover for their injuries and their attorneys' fees, and to enjoin the BOE against any future effort to impose discriminatory burdens on Plaintiffs and other members Bloomingburg's Hasidic Jewish community who seek to exercise their fundamental constitutional right to vote in Sullivan County.

## PARTIES

19.     Plaintiffs are Hasidic Jewish voters who registered to vote in Bloomingburg with the Sullivan County Board of Elections and who are qualified to vote in the Village of Bloomingburg, New York.  Having successfully registered at their addresses in Bloomingburg,

Plaintiffs' existing voter registrations constitute "presumptive evidence of their residence for voting purposes" under New York State law. *Carney v. Ward*, 991 N.Y.S.2d 383, 384 (4th Dept. 2014) (internal citations omitted).

20.     Plaintiff Moshe Smilowitz is a resident of Bloomingburg, New York.   He is qualified and registered to vote in Bloomingburg.   Defendants seek to disenfranchise Mr. Smilowitz by cancelling his registration status in advance of the March 18, 2015 election.

21.     Plaintiff Abraham Desser is a resident of Bloomingburg, New York.   He is qualified and registered to vote in Bloomingburg.   Defendants seek to disenfranchise Mr. Desser by cancelling his registration status in advance of the March 18, 2015 election.

22.     Plaintiff Mindy Desser is a resident of Bloomingburg, New York.   She is qualified and registered to vote in Bloomingburg.   Defendants seek to disenfranchise Ms. Desser by cancelling her registration status in advance of the March 18, 2015 election.

23.     Plaintiff Rivka Desser is a resident of Bloomingburg, New York.   She is qualified and registered to vote in Bloomingburg.   Defendants seek to disenfranchise Ms. Desser by cancelling her registration status in advance of the March 18, 2015 election.

24.     Plaintiff Samuel Desser is a resident of Bloomingburg, New York.   He is qualified and registered to vote in Bloomingburg.   Defendants seek to disenfranchise Mr. Desser by cancelling his registration status in advance of the March 18, 2015 election.

25.     Plaintiff Zira G. Desser is a resident of Bloomingburg, New York.   She is qualified and registered to vote in Bloomingburg.   Defendants seek to disenfranchise Ms. Desser by cancelling her registration status in advance of the March 18, 2015 election.

26.     Plaintiff David Friedman is a resident of Bloomingburg, New York.  He is qualified and registered to vote in Bloomingburg.  Defendants seek to disenfranchise Mr. Friedman by cancelling his registration status in advance of the March 18, 2015 election.

27.     Plaintiff Esther Goldberg is a resident of Bloomingburg, New York.  She is qualified and registered to vote in Bloomingburg.  Defendants seek to disenfranchise Ms. Goldberg by cancelling her registration status in advance of the March 18, 2015 election.

28.     Plaintiff Meir Goldberg is a resident of Bloomingburg, New York.  He is qualified and registered to vote in Bloomingburg.  Defendants seek to disenfranchise Mr. Goldberg by cancelling his registration status in advance of the March 18, 2015 election.

29.     Plaintiff Menachem Goldberg is a resident of Bloomingburg, New York.  He is qualified and registered to vote in Bloomingburg.  Defendants seek to disenfranchise Mr. Goldberg by cancelling his registration status in advance of the March 18, 2015 election.

30.     Plaintiff Zvi Goldberg is a resident of Bloomingburg, New York.  He is qualified and registered to vote in Bloomingburg.  Defendants seek to disenfranchise Mr. Goldberg by cancelling his registration status in advance of the March 18, 2015 election.

31.     Plaintiff Lipa Goldstein is a resident of Bloomingburg, New York.  He is qualified and registered to vote in Bloomingburg.  Defendants seek to disenfranchise Mr. Goldstein by cancelling his registration status in advance of the March 18, 2015 election.

32.     Plaintiff Hershel Green is a resident of Bloomingburg, New York.  He is qualified and registered to vote in Bloomingburg.  Defendants seek to disenfranchise Mr. Green by cancelling his registration status in advance of the March 18, 2015 election.

33.     Plaintiff Abraham Greenfield is a resident of Bloomingburg, New York.  He is qualified and registered to vote in Bloomingburg.  Defendants seek to disenfranchise Mr. Greenfield by cancelling his registration status in advance of the March 18, 2015 election.

34.     Plaintiff Hendel Greenfield is a resident of Bloomingburg, New York.  She is qualified and registered to vote in Bloomingburg.  Defendants seek to disenfranchise Ms. Greenfield by cancelling her registration status in advance of the March 18, 2015 election.

35.     Plaintiff Aron Karpen is a resident of Bloomingburg, New York.  He is qualified and registered to vote in Bloomingburg.  Defendants seek to disenfranchise Mr. Karpen by cancelling his registration status in advance of the March 18, 2015 election.

36.     Plaintiff Berl Karpen is a resident of Bloomingburg, New York.  He is qualified and registered to vote in Bloomingburg.  Defendants seek to disenfranchise Mr. Karpen by cancelling his registration status in advance of the March 18, 2015 election.

37.     Plaintiff Esther Karpen is a resident of Bloomingburg, New York.  She is qualified and registered to vote in Bloomingburg.  Defendants seek to disenfranchise Ms. Karpen by cancelling her registration status in advance of the March 18, 2015 election.

38.     Plaintiff Feigy Karpen is a resident of Bloomingburg, New York.  She is qualified and registered to vote in Bloomingburg.  Defendants seek to disenfranchise Ms. Karpen by cancelling her registration status in advance of the March 18, 2015 election.

39.     Plaintiff Pearl Karpen is a resident of Bloomingburg, New York.  She is qualified and registered to vote in Bloomingburg.  Defendants seek to disenfranchise Ms. Karpen by cancelling her registration status in advance of the March 18, 2015 election.

40.     Plaintiff Rachel Karpen is a resident of Bloomingburg, New York.   She is qualified and registered to vote in Bloomingburg.  Defendants seek to disenfranchise Ms. Karpen by cancelling her registration status in advance of the March 18, 2015 election.

41.     Plaintiff Shemaya Karpen is a resident of Bloomingburg, New York.   He is qualified and registered to vote in Bloomingburg.  Defendants seek to disenfranchise Mr. Karpen by cancelling his registration status in advance of the March 18, 2015 election.

42.     Plaintiff Isaac Kohn is a resident of Bloomingburg, New York.  He is qualified and registered to vote in Bloomingburg.   Defendants seek to disenfranchise Mr. Kohn by cancelling his registration status in advance of the March 18, 2015 election.

43.     Plaintiff Yaacov M. Sebbag is a resident of Bloomingburg, New York.   He is qualified and registered to vote in Bloomingburg.  Defendants seek to disenfranchise Mr. Sebbag by cancelling his registration status in advance of the March 18, 2015 election.

44.     Plaintiff Borech Stein is a resident of Bloomingburg, New York.  He is qualified and registered to vote in Bloomingburg.   Defendants seek to disenfranchise Mr. Stein by cancelling his registration status in advance of the March 18, 2015 election.

45.     Plaintiff Sheindel Stein is a resident of Bloomingburg, New York.   She is qualified and registered to vote in Bloomingburg.  Defendants seek to disenfranchise Ms. Stein by cancelling her registration status in advance of the March 18, 2015 election.

46.     Plaintiff Joseph S. Wasserman is a resident of Bloomingburg, New York.  He is qualified and registered to vote in Bloomingburg.  Defendants seek to disenfranchise Mr. Wasserman by cancelling his registration status in advance of the March 18, 2015 election.

47.     Defendants Ann Prusinski and Rodney Gaebel are the two Commissioners of the Board of Elections.  The Board of Elections is responsible, pursuant to Article 5 of the Election

Law, for the registration and enrollment of voters within Sullivan County, New York; and, pursuant to § 15-104 of the Election Law, for conducting all village elections within the Village of Bloomingburg, New York.

## JURISDICTION AND VENUE

48.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367.

49.     Venue in the Southern District of New York is based upon 28 U.S.C. § 1391(b). All Defendants reside in and the events or omissions giving rise to this action occurred in this District.

## FACTUAL BACKGROUND

50.     This action arises out of efforts by government actors in Sullivan County to deprive Hasidic Jews of their constitutional rights to vote. That effort is part of a larger scheme by government actors in Bloomingburg and Mamakating to discriminate against Hasidic Jews, to discourage them from moving to Bloomingburg, and to obstruct projects and religious institutions that they believe might attract Hasidic Jews to the area.

51.     The anti-Semitic animus in Bloomingburg is unmistakable. In the Village of Bloomingburg, on at least five separate occasions last summer, an individual broke the windows of Jewish-owned businesses in frightening acts of vandalism. Adjacent to the Villages of Chestnut Ridge, a planned new housing development, a landowner erected a 20-foot tall, wooden cross informing new Hasidic residents that they are unwelcome. Angry protesters have hectored and cursed at Orthodox Jewish women as they push babies in strollers through the public streets. One of the RCC's founders has admitted that the opposition to the Villages of Chestnut Ridge began only after residents learned that "the developer planned a Hasidic community." And

another RCC founder has been elected as Town Supervisor for the purpose, in his words, of seeking "to stop the Jewish infiltration."

52.     This Court currently has in front of it a civil rights action brought against Bloomingburg and Mamakating officials on account of their unlawful efforts to obstruct developments in those municipalities based upon the religion of their owners, tenants, or expected owners and tenants. *See* Amended Complaint (Dkt. No. 43), *Bloomingburg Jewish Educational Center v. Village of Bloomingburg, NY*, No. 7:14-cv-07250-KBF (S.D.N.Y. Nov. 26, 2014).

53.     In addition, the anti-Semitism in the region has manifested itself in the Pine Bush School District, which includes Bloomingburg. On March 28, 2012, Jewish parents brought a lawsuit against Pine Bush for failing to stop rampant religious discrimination against Jewish public school students. *See* Complaint (Dkt. No. 25), *Eccleston v. Pine Bush Central School Dist.*, No. 7:12-cv-2303-KMK (S.D.N.Y. Mar. 28, 2012). Plaintiffs allege that the students had suffered both physical and psychological abuse in the form of relentless anti-Semitic discrimination, harassment, and bullying by other students, without any action by school officials to protect them.

54.     The U.S. Attorney for the Southern District of New York has opened an investigation into these allegations of anti-Semitism and filed a brief in support of the Plaintiffs on summary judgment. *See* Benjamin Weiser, U.S. Investigates Anti-Semitism Claims at Pine Bush Schools, N.Y. TIMES, Nov. 13, 2013, available at http://www.nytimes.com/2013/11/14/nyregion/us-investigates-anti-semitism-claims-at-pine-bush-schools.html. This Court recently denied the defendants' motions for summary judgment in that case and directed the parties to proceed to trial on the majority of the plaintiffs' claims

A.     **Town and Village Officials Seek To Dissolve Bloomingburg.**

55.     Beginning in 2006, Mamakating and Bloomingburg began the approval process for Chestnut Ridge, a planned community that will contain 396 townhouses and promises to revitalize what had previously been a depressed area in Sullivan County.  For years, the Town and Village strongly supported the development at Chestnut Ridge.  In early 2012, however, rumors arose that Hasidic Jews might purchase townhouses in that development, and anti-Hasidic sentiment has intensified as Bloomingburg's Hasidic Jewish population has grown.

56.     The emergence of these rumors dramatically changed community sentiment. Soon thereafter, a group of anti-Hasidic residents organized themselves as the "Rural Community Coalition," with the avowed purpose of preserving the "rural character" of the area and opposing the Chestnut Ridge development.  Over the past three years, the RCC and its allies have tried in a number of ways to block developments in Bloomingburg that they believe are affiliated with Orthodox Jews, and many of those actions are the subject of the pending *Bloomingburg Jewish Education Center* action.

57.     In the summer of 2014, the RCC and public officials in Bloomingburg and Mamakating initiated a petition for a referendum vote on whether the Village of Bloomingburg should be dissolved.  If the Village of Bloomingburg dissolves, then the Town of Mamakating would assume control over all affairs previously conducted by the Village.  The dissolution supporters hope that dissolving Bloomingburg would block further development at Chestnut Ridge and on other projects believed to serve Hasidic Jews.  At a minimum, dissolution would dilute the vote of the Hasidic Jewish population and ensure that the current public officials remain in power.

58.     The Village Board scheduled the dissolution referendum vote for a Special Election on September 30, 2014, during the Jewish High Holy Days, in the ten-day period of time between Rosh Hashanah and Yom Kippur.  These holidays signify the most sacred time of the year in the Jewish faith.  Strictly observant Hasidic Jews attend synagogue and focus on prayer for the duration of these holidays.  The Village appears to have scheduled the dissolution referendum at that time in the hope that the Hasidic Jews of Bloomingburg would be distracted by their religious observances from voting in the referendum vote.

### B.      Plaintiffs' Voter Registrations Are Challenged Days Before the September 2014 Special Election.

59.     In the week leading up to the Special Election, Anita M. Hoppe, with the help of others affiliated with the RCC, filed with the BOE, pursuant to Election Law § 5-220, affidavits challenging the registrations of 194 voters in Bloomingburg (the "Challenge Affidavits").  The Challenge Affidavits used boilerplate language and did not attest to any personal knowledge that the challenged voters did not reside at the addresses on the voter rolls.  Instead, the Challenge Affidavits contain vague, inaccurate, and/or contradictory observations, essentially limited to a superficial description of the physical condition of the challenged voters' residences (*e.g.*, description of house lighting, vehicles in driveway, window coverings, yard conditions, etc.), apparently made by members of the RCC while spying on challenged voters' residences over several weeks.  None of the Challenge Affidavits included any information that could provide the BOE with a reason to believe that the challenged voters were not qualified to vote in Sullivan County.[1]

---

[1] In fact, some of the affidavits actually corroborate that the challenged voters reside at their given address.  For example, several affidavits reference vehicles that are registered to the challenged voters residing at the address where the vehicles were purportedly observed.

60.     Although the Challenge Affidavits do not include any observations after September 14, 2014, the Affidavits were not submitted to the Board of Elections until September 24, 25, or 26, mere days before the September 30 Special Election.  It appears that Ms. Hoppe and her supporters waited to file these affidavits until the eve of Rosh Hashanah and just days before the election.  Ms. Hoppe and her supporters evidently intended to frustrate Plaintiffs' ability to respond to the Challenge Affidavits before the Special Election.

61.     Of the 194 Challenge Affidavits, 172 challenged the registration of voters of Hasidic Jews.  Eleven challenged Orthodox Jewish voters who were associated with the Chestnut Ridge development.  Although the challenges were frivolous and patently discriminatory in nature, the BOE elected to open an investigation into each and every challenge.

62.     Starting on September 26, 2014, the Friday before the Special Election, the BOE began to notify challenged voters that their registration status was in question.  The notice came by certified mail and included a challenged voter Questionnaire (the "Questionnaire") that the BOE would purportedly use to verify the eligibility of the voter to remain registered at their current registered address.  The mailings, however, did not comply with state law, Election Law § 5-402, which sets forth the actual procedures and notices pursuant to which a board of election could cancel any voter's registration.

63.     The Questionnaire imposed on voters with presumptively valid registrations the burden of proving their residency beyond the standard required by any state law and required them, under penalty of perjury, to complete a detailed 26 question form asking a host of irrelevant questions about the voters' prior residences, family status, employment history, and so on.

64.     The Questionnaire asked the voters (i) to identify any other properties that the voter owns, rents, or occupies; (ii) to identify how long the voter has owned, rented or occupied his residence; (iii) to identify how often the Bloomingburg residence has been used over each of the past six years; (iii) to provide lease documents that would verify tenancy; (iv) to identify the voter's marital status; (v) to identify the address on the voter's driver's license, vehicle registration, and insurance card, and to provide the BOE with copies of all of those documents; (vi) to identify any social clubs or social organizations in Sullivan County of which the voter is a member; (vii) to identify whether the voter had children, and if so, the ages of the children and where they attend school; (vii) to identify whether the voter was employed or owned his own business, the location of that business, and the nature of the voter's employment; and (viii) whether the voter disagrees with any of the factual assertions in the Challenge Affidavit.

65.     On information and belief, the BOE created this onerous Questionnaire for the sole purpose of suppressing the votes of registered Hasidic Jewish residents.  Plaintiffs are not aware of any other county in New York that employs a questionnaire for challenged voters that bears any resemblance to that of Sullivan County's.  To take one analogous example, the neighboring county of Orange County, New York employs a questionnaire that asks challenged voters to answer five simple questions concerning their current residence and their prior voter registrations, asks for no documents, and can be completed in under a minute.

**C.      The Anti-Hasidic Movement Brings Legal Action in Sullivan County To Ensure That the BOE Disenfranchises Hasidic Jews.**

66.     On September 26, 2014, two days after Ms. Hoppe filed the first Challenge Affidavits, the anti-Hasidic challengers commenced an action in New York state court to sequester all votes that the challenged voters would cast during the Special Election.  The challengers proposed to seal each challenged ballot and to mark each envelope with the name

and address of the voter, so that the court could review the validity of the voter registrations in question. *See Francis v. Prusinski*, No. 2014-2294 (Sup. Ct. Sullivan County). The challengers did not name the challenged voters as parties to the Order to Show Cause proceeding. On September 29, 2014, the day before the Special Election, the New York court granted the Order to Show Cause and required that the challenged ballots be sealed and delivered for his review.

67.     The New York court also ordered that all Bloomingburg voters in the Special Election would vote by affidavit ballot. This was contrary to New York election law. *See Delgado v. Sunderland*, 97 N.Y.2d 420, 423 (2002) (explaining that any action the trial court takes regarding an election must be expressly authorized and supported by the state's Election Law statute). To vote by affidavit ballot, the voter must sign an affidavit that will be returned to the BOE, along with the ballot itself, for a determination as to its validity. By statute, an affidavit ballot is used when a would-be voter does not appear on the rolls or has not provided an approved form of ID for a first-time voter, neither of which apply here. N.Y. Elec. §§ 8-302, 8-303.

68.     By contrast, the Election Law prescribes that if a voter's registration has been challenged, the voter may take a "Qualification Oath," administered by the election inspector at the poll, acknowledging that "all the statements you have made to the board have been true and that you understand that a false statement is perjury and you will be guilty of a misdemeanor." N.Y. Elec. §§ 5-220(2), 8-502, and 8-504(3). Upon taking the oath, New York state law unequivocally provides that the vote must be counted. N.Y. Elec. § 8-504.

69.     Accordingly, the New York state court lacked the legal authority to order the challenged voters or the entire population of Bloomingburg to vote by affidavit ballots. The

court's error was invited by the RCC's eleventh-hour petition, which asked the New York court to take emergency action a day before the election.

70. On September 30, 2014, 69 of the 194 challenged voters, including named Plaintiffs, voted in the Special Election. On the day of the Special Election, September 30, 2014, Defendants did not allow Plaintiffs to take the Qualification Oath and vote, but instead required Plaintiffs to vote by affidavit ballots, which were then segregated pending a future judicial determination.

**D.   The Sheriff Investigates the Residency of the Challenged Voters and Determines That Many Indeed Reside at Their Listed Address.**

71. Following the Special Election, the BOE asked the Sullivan County Sheriff to investigate the challenged voters, including by interviewing the challenged voters and seeking to examine their homes.  In October 2014, the Sheriff conducted investigations into the Challenged Affidavits.  The Sheriff recorded the results of each investigation on a "Voter's Check Card," which indicated, among other things, whether the investigating officer was "satisfied that the Registrant resides at the given address."

72. For example, at approximately 4 p.m. on October 13, 2014, Officer Luis Alvarez arrived at 8 Winterton Road in Bloomingburg and asked to see Plaintiff Moshe Smilowitz.  The officer certified that the residence "appeared to be physically capable of occupancy."  After asking a few questions regarding the status of other members of Mr. Smilowitz's family, the officer attested that he was satisfied Mr. Smilowitz lived at 8 Winterton Road.

73. To take another example, on October 15, 2014, at approximately 4 p.m., Officer Eric Chaboty arrived at 14 Winterton Road in Bloomingburg and asked to see Plaintiff Samuel Desser.  The officer concluded that the residence appeared physically capable of occupancy.

19

After interviewing Mr. Desser, the officer determined he was satisfied Samuel Desser lives at 14 Winterton Road.

74.     Based on documents received from a Freedom of Information Law request, the Sheriff appears to have investigated most, if not all, of the challenged voters. The Sheriff was able to confirm to his satisfaction that a number of the challenged voters lived at the residence on their voter roll. In other instances, the Sheriff was not able to confirm residency, not because the Sheriff found that they did not reside at the address, but simply because they were not present when the officer arrived to inspect their homes.

75.     While this investigation was ongoing, on November 4, 2014, New York State conducted a general election for federal and state officers, including four members of Congress and the Governor of New York. Many challenged voters voted in the election in Bloomingburg, including 23 of the named Plaintiffs. Neither the RCC nor the BOE purported to challenge any of the votes in that election, demonstrating that Defendants' concern is political control of Bloomingburg, not any genuine belief or concern for Plaintiffs' residences.

### E.      The Board of Elections Grants Most of the Challenges.

76.     On November 19, 2014, the BOE issued a Notice of Determination ("November Determination") granting 188 of the 194 challenges. The November Determination recites that the BOE sent out 194 questionnaires and that 68 questionnaires were returned to the Board of Elections. The BOE stated that it would "negate [the voters'] right to have their vote counted" in the Special Election and place the voters on "inactive" status. In the November Determination, the Board of Elections purported to annul the votes of 63 of the 69 challenged voters who had voted in the Special Election, including Plaintiffs. The BOE's reasoning was neither clear nor consistently applied.

77.     The BOE grossly overlooked obvious and important information evidence that many of the 194 challenged voters remained properly registered and qualified to vote in the Village of Bloomingburg.  As to Plaintiffs, the Board of Elections failed to consider that nearly all of them:  (1) appeared in-person to vote during the Special Election and, under the penalty of perjury, executed an affidavit ballot confirming their qualifications to vote in the Village of Bloomingburg; (2) completed and executed, under penalty of perjury, the questionnaires; and (3) voted in-person during the November general election after taking an oath, under penalty of perjury, re-verifying their continued qualifications to vote in the Village of Bloomingburg.  The BOE's omission of any discussion of such material information in the November Determination betrays its true agenda.

78.     The BOE described itself as "confronted with an apparently mobile population," expressly recognizing that it had singled out the Hasidic Jewish community as a class.  Even though the Board had entertained challenges to 194 voters brought by a handful of individuals affiliated with the RCC, the Board deemed it suspicious that the challenged voters had themselves responded in an organized fashion, questioning the fact that the questionnaires had been collected by individuals affiliated with Bloomingburg's Jewish community and returned "over a period of about 7-12 days in 40 separate large manila envelopes."

79.     The Board admitted that New York election law broadly permits New York residents to vote in their residency of choice, but then made excuses to construe those rules narrowly to avoid counting Hasidic Jewish votes.  For instance, the Board admitted that what it called "the vagaries of NYS Election law do allow voters with multiple residences to choose one from which they wish to vote," but then found that it would not count those votes absent "significant as well as verifiable ties to the address and community that they so designate."

80.     Likewise, the Board admitted that "Election law does permit students to register from their temporary/scholastic address," but refused to apply that rule to Hasidic Jewish students residing in Bloomingburg, because that "in our opinion this should not pertain to schools without accreditation or a fixed address that holds classes on what can best be described as a capricious schedule."  The Board did not explain why accreditation should matter or the basis for its opinion that the Hasidic Jewish students were not studying at a school with a fixed address.

81.     Notably, the BOE specifically ignored the Sheriff's attestations that many of the challenged voters actually lived at the residences in question.  The BOE stated in general terms that it had relied upon the results of the Sheriff's investigation, which had been conducted at the BOE's own behest, but it in fact did so only when the results favored the cancellation of the vote. Where the Sheriff could not confirm whether the voter resided at the given address, the BOE treated that judgment as proof the voter did not live in Bloomingburg.  Where the Sheriff believed the voter resided at the address, the BOE took the position that "without the submission of ANY proof whatsoever that the challenged voter has met the minimum residency requirement, the challenge shall be GRANTED."

82.     The BOE also purported to cancel votes on the ground that certain residences did not have certificates of occupancy on file with the Village.  Many buildings in Bloomingburg lack such certificates of occupancy, but have nonetheless been occupied by voters for decades. Whether an occupied residence has, or needs, a certificate of occupancy is a matter for the Village Building Code, not for the Election Law.  Where a voter actually lives in Bloomingburg in a physically occupied residence, he or she is entitled to vote.  There is no legal basis for the conclusion that the absence of a certificate of occupancy deprives a resident of the right to vote.

22

There is no indication that the BOE ever before went through the Bloomingburg voter rolls to determine whether longstanding residents have certificates of occupancies for their homes. This newfound barrier was invented exclusively for disenfranchising Hasidic Jewish voters.[2]

83.     The BOE's determination plainly would have resulted in the disenfranchisement of lawful Bloomingburg residents.  For example, the BOE cancelled the voter registrations of seven members of the Smilowitz family (Plaintiff Moshe, Devorah, Hindy, Miriam, Shulem, Yidel, and Zev), all of whom then resided at 8 Winterton Road.  In completing the Questionnaire, all seven submitted the lease to their home.  The BOE also had evidence that Devorah, Hindy, and Zev were employed in Bloomingburg.  Moshe attested that he is in Bloomingburg daily.  The Sheriff concluded that all seven members of the Smilowitz family lived at 8 Winterton Road.  Nevertheless, the BOE purported to cancel the registration of all seven members of the Smilowitz family.

84.     To take another example, the Sheriff confirmed that Plaintiff Joseph S. Wasserman lived at 101 Main Street in Bloomingburg.  The BOE nonetheless cancelled his voter registration because of "Divorce pending/residing in basement apartment.  Ken Nakdimen's nephew."  It is not clear how any of those factors would be relevant to his registration, other than the fact of his residence in a basement apartment in Bloomingburg, which confirms his right to vote.

---

[2] The BOE also made reference to controversy over Bloomingburg voter registrations from March 2014, which it described as involving an "aura of sham."  The RCC's challenges began back in March 2014, and litigation over those registrations ensued in the state courts.  That litigation, however, was abruptly terminated after the FBI executed search warrants and opened an investigation, thereby chilling the civil litigation over the March 2014 election and terminating that litigation prior to any judicial findings on the allegations involved.  The BOE's decisions in November and February, however, were based upon the administrative record developed in response to the recent challenges, and therefore, it is not clear what relevance the litigation in March 2014 would have to the Board's recent actions.

85.     The BOE did not erect any such arbitrary barriers when it came to reviewing the handful of non-Hasidic voters whose registrations had been challenged.  For example, the BOE denied the challenge to the voter registration of Melissa Saunders, who is not a Hasidic Jew.  Ms. Saunders was evidently challenged because she had previously lived and registered to vote at 8 Winterton Road.  But, the anti-Hasidic challengers know she no longer lives there, since 8 Winterton Road is now the home of the Smilowitz family.

86.     In contrast to appearing at her home, the Sheriff called Ms. Saunders on the telephone regarding the challenge, and Ms. Saunders explained that she had moved from 8 Winterton Road to 23 Amberlite Road.  Based upon this information, the BOE denied the challenge to Ms. Saunders's registration because she "remains an active voter in the Village." By stark contrast, Hasidic Jewish voters who are "active" voters in Bloomingburg, whose residence was physically confirmed by the Sheriff, and who swore to their residence under penalty of perjury fell short of the BOE's standards.

**F.      The New York Court Orders the Votes To Be Counted in the Special Election.**

87.     In December 2014, a group of challenged voters filed an Article 78 proceeding to challenge the BOE's unlawful acts in New York state court.  *See Matter of Berger, et al. v. Prusinski, et al.*, Index No. 2716-2014, (Sup. Ct., Sullivan County).  Petitioners in the *Berger* Action alleged that the BOE's November Determinations to cancel their September votes and to place their voter registrations in "inactive" status were arbitrary and capricious, contrary to law, and constituted a clear abuse of discretion.

88.     On December 19, 2014, the New York Supreme Court ruled that the BOE had acted unlawfully in seeking to cancel the votes from the Special Election.  *See* Order, *Berger*, No. 2716-2014 (N.Y. Sup. Ct. Dec. 19, 2014).  The BOE lacked the authority to cancel the votes

of registered voters who had voted by affidavit in the Special Election. *Id.* Accordingly, the state court ruled that the challenged votes should be counted and that the results of the Special Election should be certified. The 69 challenged votes were thus counted, and the dissolution failed by the margin of 107 to 85.

**G.    Defendants Seek To Disenfranchise Hasidic Jewish Voters Prior To The March 2015 Election.**

89.    Undeterred by the New York court's order, the BOE tried again to disenfranchise Hasidic Jewish voters in Bloomingburg. On January 16, 2015, the BOE issued Notices of Voter Registration Cancellation (the "Cancellation Notices") to approximately 184 voters, over 160 of whom are Hasidic Jews. The notices indicated that the Board intended to cancel their voter registrations and to deprive them of their right to vote. The noticed voters overlap substantially with the originally challenged voters as well as those whom the BOE unsuccessfully sought to disenfranchise in November. All named Plaintiffs received Cancellation Notices.

90.    The Cancellation Notices provide two means for noticed voter to respond. First, noticed voters may return "documentation of county residency in writing." The BOE set the arbitrary deadline of February 2, 2015 for the submission of any additional documentation (which was subsequently extended to February 6). Second, noticed voters could appear and be heard before the BOE Commissioners on either January 28 or January 29, between 11 a.m. and 3 p.m. These narrow windows fell in the middle of the workday on a Wednesday and Thursday.

91.    Section 5-402(2) of the Election Law provides that a voter must be notified that he/she "may appear before the board or answer in writing by mail, stating the reasons why his registration should not be cancelled." The statute expressly indicates that a voter may state the reasons why his registration should not be cancelled on the postage paid return card

25

accompanying the notice.  By contrast, the Cancellation Notices impose burdensome evidentiary requirements that have no foundation in New York Election Law.

92.    The BOE held the first hearing on January 28 and, because of a winter storm, held the second on February 4.   Given the limited and inconvenient times set by the Board of Elections, 21 of the voters who received the notices were able personally to appear at the hearings.

93.    At the hearings, the voters were invited to appear before the BOE, explain their residency status, and also provide evidence concerning family members and others who live in Bloomingburg.  While the statements were not sworn, New York law imposes criminal penalties for false statements made in an effort to support voter registration.  *See* N.Y. Elec. §§ 17-104; 17-132; N.Y. Penal §§ 175.35, 210.45.   At no point during these hearings did either Commissioner ask any noticed voter even a single question.

94.    The voters also presented more than 800 pages of documents to the BOE.  These documents included affidavits, utility bills, drivers' licenses, and leases attesting to the voters' residency.  Plaintiffs all submitted the Questionnaires to the BOE and many submitted additional evidence verifying their residency in Bloomingburg.

### H.    Defendants Prospectively Cancel Voter Registrations Against The Overwhelming Weight of the Evidence.

95.    On February 27, 2015, the Board of Elections released a perfunctory Notice of Determination (the "February Determination"), which purports to cancel all but 28 of the 184 noticed voter registrations, including all of named Plaintiffs' voter registrations.[3]   While the

---

[3] The February Determination lists 250 voters and cancels 205 of them.  Most of the additional challenged voters beyond the 184 in the January notice appear to have come from a separate challenge involving people who no longer live in Bloomingburg.  Most of those voters did not respond to a separate questionnaire from the BOE, and the BOE evidently granted the challenges on that basis.

November Determination had provided sparse and arbitrary reasons for cancelling votes, the February Determination does not provide any reason at all. The February Determination consists of a cover letter and a table listing the names of the voters who were issued a Notice of Cancellation. The BOE indicated its determination with respect to each individual voter by checking a box labeled either "ACTIVE" or "TO BE CANCELLED".

96.     The February Determination fails to comply with the Election Law, which requires the BOE to explain the reason for any cancellation of voter registration. N.Y. Elec. § 5-402(3). The February Determination does not provide any reasons for the BOE's decisions, nor does it purport to explain how or why the BOE ignored the volumes of evidence supporting the existing registrations.

97.     Upon information and belief, from 2004 to 2014, the Board cancelled 528 voter registrations in Sullivan County. Merely two months into 2015, the Board has cancelled 205 Bloomingburg voter registrations, nearly 40% of the number of registrations cancelled in the entire county over the last decade. These numbers plainly demonstrate the extraordinary and irregular actions of the BOE.

98.     Rather than address the evidence submitted, the BOE plainly disregarded the evidence in its custody that Plaintiffs remained properly registered and qualified to vote in the Village of Bloomingburg. Indeed, as to each named Plaintiff, the evidence overwhelmingly confirmed residency in Bloomingburg:

A.     Plaintiff Moshe Smilowitz voted by affidavit in the Special Election and submitted to the BOE a completed Questionnaire. Moshe Smilowitz asserted, "[t]he affidavit does not refer to me. I don't understand the allegations made as to why I am not a voter. No one challenged my vote in the primary." He also asserted, "[t]here is no

basis to challenge me or my right to vote. I work in Bloomingburg and am present in the village every day." Moshe Smilowitz submitted his New York State driver's license. Officer Luis Alvarez investigated and confirmed that Moshe Smilowitz had resided at 8 Winterton Road since February 2014. Nevertheless, in the November Determination, the BOE granted the challenge against him and purported to annul his vote. The BOE's justification for cancelling Moshe Smilowitz's vote included, "[n]o compelling proof of 7 month residency was submitted." Moshe Smilowitz appeared before the BOE on February 4, 2015. Moshe Smilowitz presented utility bills, insurance bills, and his New York State driver's license with a Bloomingburg address. In the February Determination, the BOE cancelled Moshe Smilowitz's voter registration without explanation.

B.    Plaintiff Abraham Desser voted by affidavit in the Special Election and submitted to the BOE a completed Questionnaire. Nevertheless, the BOE granted the challenge to his voting registration and purported to annul his vote in the September election. The BOE justified cancelling his vote by asserting, "Abraham is a student," and that he did not offer proof of residency beyond the sworn affirmation. Abraham Desser provided an affirmation to the BOE on February 2, 2014. In the February Determination, the BOE cancelled Abraham Desser's registration without explanation.

C.    Plaintiff Mindy Desser voted by affidavit in the Special Election and submitted to the BOE a completed Questionnaire. Mindy Desser resides with Plaintiff Samuel Desser at 14 Winterton Road. Officer Eric Chaboty investigated Mindy Desser's residency on October 15, 2014. Mindy Desser was not present, but Abraham Desser told the officer that Mindy Desser resided at the address. Officer Chaboty determined the residence was capable of physical occupancy. Nevertheless, the BOE granted the

challenge to Mindy Desser's voting registration and purported to annul her vote in the November Determination. The BOE based cancelling her vote in part on the fact that her home did not have a Certificate of Occupancy. In the February Determination, the BOE cancelled her registration without explanation.

D.    Plaintiff Rivka Desser voted by affidavit in the Special Election and submitted to the BOE a completed Questionnaire. Rivka Desser resides with Plaintiff Abraham Desser at 12 Hickory Court. The BOE granted the challenge to Rivka Desser's voting registration and purported to invalidate her vote in the November Determination. The BOE relied on the same reasoning used to deny Abraham Desser's registration, specifically that "Abraham is a student," and that neither offered proof of their residency at 12 Hickory Court. Abraham Desser submitted an additional affirmation as to their residency on February 5, 2015. In the February Determination, the BOE cancelled Ms. Desser's registration without explanation.

E.    Plaintiff Samuel Desser voted by affidavit in the Special Election and submitted to the BOE a completed Questionnaire. Officer Eric Chaboty investigated and concluded that Mr. Desser resided at 14 Winterton Road since January 2014. Officer Chaboty noted that the residence did not have a Certificate of Occupancy, but determined the residence was physically capable of occupancy. Nevertheless, the BOE granted the challenge to Samuel Desser's voting registration and invalidated his vote in the November Determination. The BOE based its action in part on the absence of a Certificate of Occupancy. Samuel Desser appeared before the BOE on February 4, 2014. He supported his claim of residency with a New York State Driver's License and Registration reflecting his Bloomingburg address. Samuel Desser further submitted a

sworn affirmation on February 5, 2015.   In the February Determination, the BOE
cancelled Samuel Desser's registration without explanation.

      F.    Plaintiff Zira Desser voted by affidavit in the Special Election and
submitted to the BOE a completed Questionnaire.   Zira Desser resides with Plaintiff
Samuel Desser at 14 Winterton Road.   Officer Eric Chaboty visited Zira Desser's home
on October 15, 2014.   Zira Desser was not present then, but Abraham Desser told Officer
Chaboty that she resided at the address.   Officer Chaboty determined the residence was
capable of physical occupancy.   Nevertheless, the BOE granted the challenge to Zira
Desser's voting registration and invalidated her vote in the November Determination.
The BOE based its denial in part on the absence of a Certificate of Occupancy.   Samuel
Desser appeared before the BOE and stated that Zira Desser resided with him at 14
Winterton Road.   In the February Determination, the BOE cancelled Zira Desser's
registration without explanation.

      G.    Plaintiff David Friedman voted by affidavit in the Special Election and
submitted to the BOE a completed Questionnaire.   On November 19, 2014, the BOE
granted the challenge to David Friedman's voting registration and invalidated his vote in
the Special Election.   The BOE based its denial of David Friedman's vote on the
inconclusive results of the Sheriff's investigation.   David Friedman appeared before the
BOE on January 29, 2015 to establish his residence at 12 Hickory Court.   David
Friedman's sister, Hindy Smilowitz, also appeared before the BOE on January 29, 2015
to assert that David Friedman lived behind her residence at 12 Hickory Court.   The BOE
nonetheless cancelled David Friedman's registration on February 27, 2015 without
explanation.

H.     Plaintiff Esther Goldberg voted by affidavit in the Special Election. Officer Victor D. Zayas investigated her residence and based his conclusion that Esther Goldberg did not reside at the address on an interview with a neighbor who "viewed the residence when the door was left open" and "only observed a desk and states that the premises looks like an office." Esther Goldberg submitted to the BOE a completed Questionnaire on October 8, 2014. In response to the initial challenge, Esther Goldberg asserted, "someone who passes by my house a few times can't really determine that I really live there, they should of knocked on the door and I would have invited them in. My father [chose] a residence close to his daily work in Bloomingburg, NY. I live with my parents and as an American citizen I can vote where I live." Nevertheless, the BOE granted the challenge to Esther Goldberg's voting registration and invalidated her vote in the November Determination. The BOE based its annulment of Esther Goldberg's vote on her failure to provide a Certificate of Occupancy. To further establish her residency at 105 Main Street, Esther Goldberg submitted to the BOE her residential lease at 105 Main Street and a sworn affirmation on February 5, 2015. In the February Determination, the BOE nonetheless cancelled Esther Goldberg's registration without explanation.

I.     Plaintiff Meir Goldberg voted by affidavit in the Special Election and submitted to the BOE a completed Questionnaire. In the November Determination, the BOE granted the challenge to his voting registration and invalidated his vote in the Special Election. The BOE based its annulment of Meir Goldberg's vote in part on his failure to provide a Certificate of Occupancy. To establish his residence, Meir Goldberg's father, Judah Goldberg, submitted a lease agreement for 105 Main Street and a bank statement. Meir Goldberg further submitted an affirmation on February 5, 2015.

31

Nevertheless, the BOE cancelled Meir Goldberg's registration on February 27, 2015 without explanation.

J.      Plaintiff Menachem Goldberg voted by affidavit in the Special Election and submitted to the BOE a completed Questionnaire. In the November Determination, the BOE granted the challenge to Menachem Goldberg's voting registration and invalidated his vote in the Special Election. The BOE based its cancellation of Menachem Goldberg's vote in part on his failure to provide a Certificate of Occupancy. To establish his residence, Menachem Goldberg's father, Judah Goldberg, submitted a lease agreement for 105 Main Street and bank statement. Menachem Goldberg further submitted an affirmation on February 5, 2015. Nevertheless, in the February Determination, the BOE cancelled Menachem Goldberg's registration without explanation.

K.      Plaintiff Zvi Goldberg voted by affidavit in the Special Election and submitted to the BOE a completed Questionnaire. In the November Determination, the BOE granted the challenge to Zvi Goldberg's voting registration and purported to invalidate his vote in the Special Election. The BOE based its cancellation of his vote in part on his failure to provide a Certificate of Occupancy. To establish his residence, Zvi Goldberg's father, Judah Goldberg, submitted a lease agreement for 105 Main Street and bank statement. Zvi Goldberg further submitted an affirmation on February 5, 2015. Nevertheless, in the February Determination, the BOE cancelled Zvi Goldberg's registration without explanation.

L.      Plaintiff Lipa Goldstein voted by affidavit in the Special Election and submitted to the BOE a completed Questionnaire. In response to the initial challenge,

Lipa Goldstein asserted, "[i]t is all general complaints and has nothing to do with me specifically. What does it have to do with me at all." He further stated, "[m]y basic right to vote is being challenged and I live in Bloomingburg. I can come and go when I see fit." Lipa Goldstein also submitted a New York State Learner's Permit. Nevertheless, the BOE granted the challenge to Lipa Goldstein's registration and purported to invalidate his vote in the Special Election. The BOE based its cancellation of Lipa Goldstein's vote on the fact that Lipa Goldstein is a "student 'staying with' Chaim Rosenbaum" and had a Brooklyn address on his learner's permit. In the February Determination, the BOE cancelled Lipa Goldstein's registration without explanation.

M.     Plaintiff Hershel Green submitted to the BOE a completed Questionnaire. In response to the initial challenge, Hershel Green wrote, "I [d]on't understand the compla[int's] connection to me[;]all general not about me" and further wrote, "I live and work in [B]loomingburg for 8 months it is my basic right to vote here." Hershel Green also submitted his New York State driver's license. Nevertheless, the BOE granted the challenge to Hershel Green's registration in the November Determination. The BOE based its denial of Hershel Green's constitutional rights on the fact that Hershel Green worked in Bloomingburg, but had a driver's license with a Monsey address; and the fact that Hershel Green's listed address did not have a Certificate of Occupancy. Mr. Green appeared before the BOE and attested to his residency in Bloomingburg; he was not subject to any cross-examination. Nonetheless, in the February Determination, the BOE cancelled his registration without explanation.

N.     Plaintiff Abraham Greenfield voted by affidavit in the Special Election and submitted to the BOE a completed Questionnaire. In response to the initial

challenge, he asserted, "[t]he affidavit[']s assertions are generic in nature. They have nothing specific about me," and further, "I am registered to live and vote in Bloomingburg. The fact that my basic right to vote is being challenged is shocking." Officer Luis Alvarez investigated Mr. Greenfield's residency on October 13, 2014 and interviewed Mr. Greenfield's father-in-law, Moshe Smilowitz. Officer Alvarez determined the residence was physically capable of occupancy and that Mr. Greenfield had resided there since February 2014. Nevertheless, the BOE granted the challenge his registration and purported to invalidate his vote in the Special Election. The BOE based this decision on his status as "a student with another residence in Brooklyn." To establish his residency, Abraham Greenfield submitted a residential lease agreement and a reply card to the BOE. In addition, his wife's parents appeared before the BOE on February 4, 2015 and attested that Mr. Greenfield resided at 8 Winterton Road with his wife. Devorah Smilowitz, his mother-in-law, stated that Mr. Greenfield cold not attend the hearing because his wife, Hendel Greenfield, was enduring a high-risk pregnancy. In the February Determination, the BOE nonetheless cancelled Abraham Greenfield's registration without explanation.

O.    Plaintiff Hendel Greenfield voted by affidavit in the Special Election and submitted to the BOE a completed Questionnaire. Officer Luis Alvarez investigated her husband's residency on October 13, 2014. Her father, Moshe Smilowitz, confirmed that Hendel Greenfield was married to Abraham Greenfield. Officer Alvarez determined the residence at 8 Winterton Road was physically capable of occupancy. Officer Alvarez concluded that Hendel Greenfield's husband, Abraham Greenfield, resided at 8 Winterton Road since February 2014; he did not file a separate report for Hendel Greenfield.

34

Nevertheless, the BOE granted the challenge to Ms. Greenfield's registration and purported to invalidate her vote in the Special Election. The BOE justified the cancellation of her vote by asserting, "Hendel is a teacher with a child going to school in Brooklyn." To establish Hendel's residency, Abraham Greenfield submitted a residential lease agreement and a reply card. In addition, Hendel Greenfield's parents appeared before the BOE on February 4, 2015 and asserted that she resided at 8 Winterton Road, but could not attend the hearing because she was enduring a high-risk pregnancy. The BOE nonetheless cancelled Hendel Greenfield's registration on February 27, 2015 without explanation.

P.     Aron Karpen voted by affidavit in the Special Election and submitted to the BOE a completed Questionnaire. He supported his residency at 26 Winterton Road with a New York State vehicle registration that listed his name and a Bloomingburg address and his New York State driver's license. Aron Karpen's brothers, Chaim and Zev Karpen, also produced documents to support Aron Karpen's residency. Nevertheless, the BOE granted the challenge to Aron Karpen's registration and invalidated Aron Karpen's vote in the Special Election in the November Determination. The BOE ignored the fact that Aron Karpen's vehicle Registration listed his Bloomingburg address and instead based its determination on the Brooklyn address on his New York State driver's license. Brothers Chaim and Zev Karpen also appeared before the BOE on January 29, 2015 to establish that they lived with sibling Aron Karpen in the same Bloomingburg home. In the February determination, the BOE cancelled Aron Karpen's registration without explanation.

Q.      Berl Karpen voted by affidavit in the Special Election and submitted to the BOE a completed Questionnaire.  He supported his residency at 26 Winterton Road with documents provided by brothers Chaim Karpen and Zev Karpen with whom he lives. Nevertheless, the BOE granted the challenge to Berl Karpen's registration and invalidated his vote in the Special Election in the November Determination.  The BOE based its cancellation of his vote on the assertion that the licenses with a Bloomingburg address submitted by Chaim Karpen and Zev Karpen were insufficient.  Chaim Karpen and Zev Karpen later submitted insurance identification cards, a cell phone bill, and bank statements containing their Bloomingburg address.  Chaim and Karpen also appeared before the BOE on January 29, 2015 to establish that they live with Berl Karpen in the same Bloomingburg home.   In the February Determination, the BOE nonetheless cancelled Berl Karpen's registration without explanation.

R.      Plaintiff Esther Karpen voted by affidavit in the Special Election.  Officer Eric Chaboty investigated her residency at 26 Winterton Road and determined that the residence was physically capable of occupancy, and that she had lived there since January 2014.  Esther Karpen also submitted to the BOE a completed Questionnaire.  In it, she asked BOE to consider the difficulty in submitting the document in a timely manner given her observance of the Jewish high holidays.   She also submitted a two-page addendum directly responding to and rebutting arguments from the challenge affidavit, further asserting, "Do not allow the hatred of individuals to make a mockery out of the justice and equality I have come to expect in this country.  I am confident that the BOE will not repeat the same act of baseless discrimination in deciding this matter." Nevertheless, the BOE granted the challenge to Esther Karpen's registration and

purported to invalidate her vote in the November Determination.   The Notice of Determination cancelling Esther Karpen's vote does not specifically provide a basis for the cancellation.   Chaim and Zev Karpen appeared before the BOE on January 29, 2015 to establish that they lived in the same Bloomingburg home with their sister, Esther Karpen, and provided certain documents to support her residency.   In the February Determination, the BOE cancelled Esther Karpen's registration without explanation.

S.     Plaintiff Feigy Karpen voted by affidavit in the Special Election and submitted to the BOE a completed Questionnaire.   She wrote, "I lived here for the past nine months and can't see a reason to be challenged" and further, "[people] spying on me is an invasion of my privacy.   I may leave my house whenever I want with people . . . after me."   Feigy Karpen also submitted a New York State learner's permit and brother Chaim Karpen's insurance card with a Bloomingburg address.   Nevertheless, the BOE cancelled Feigy Karpen's registration and purported to invalidate her vote in the Special Election.   The BOE's Notice of Determination justified cancelling her vote on the ground that her learner's permit had a Brooklyn address, and that the Sheriff did not interview her.   Brothers Chaim and Zev Karpen then appeared before the BOE on January 29, 2015 to establish that they lived in with sibling Feigy Karpen in the same Bloomingburg home. In the February Determination, the BOE cancelled Feigy Karpen's registration without explanation.

T.     Plaintiff Pearl Karpen voted by affidavit in the Special Election and submitted to the BOE a completed Questionnaire.   Pearl Karpen supported her residency at 26 Winterton Road with documents provided by brothers Chaim Karpen and Zev Karpen on January 29, 2015.   Nevertheless, the BOE granted the challenge to Pearl

Karpen's registration and purported to invalidate Pearl Karpen's vote in the Special Election. The BOE did not specifically provide a reason for that action. Chaim and Zev Karpen also appeared before the BOE on January 29, 2015 to establish that they lived with their sister, Pearl Karpen, in the same Bloomingburg home. In the February Determination, the BOE cancelled her registration, again without explanation.

U.    Plaintiff Rachel Karpen voted by affidavit in the Special Election and submitted to the BOE a completed Questionnaire. The BOE granted the challenge to Rachel Karpen's registration and invalidated Rachel Karpen's vote in the November Determination. The BOE did not specifically provide a reason for that action. Rachel Karpen supported her residency at 26 Winterton Road with documents provided by brothers Chaim and Zev Karpen, who also appeared before the BOE on January 26, 2015 and established they lived with her in the same Bloomingburg home. In the February Determination, the BOE cancelled her registration without explanation.

V.    Plaintiff Shemaya Karpen voted by affidavit in the Special Election and submitted to the BOE a completed Questionnaire. Officer Eric Chaboty investigated his residency at 26 Winterton Road, determined that it was physically capable of occupancy, and that Shemaya Karpen had resided there since January 2014. Nevertheless, the BOE granted the challenge to her registration and invalidated his vote in the Special Election in the November Determination. The BOE's Notice of Determination justified cancelling his vote on the ground that the sheriff's interview was "inconclusive." This determination directly conflicts with the investigation form signed by Officer Chaboty, which concludes that Shemaya Karpen resided at the listed address. Despite this flagrant

discrepancy and oversight, the BOE again cancelled Shemaya Karpen's registration in the February Determination.

W.      Plaintiff Isaac Kohn voted by affidavit in the Special Election and submitted to the BOE a completed Questionnaire.  Isaac Kohn wrote, "I am a full time student in Bloomingburg, and a legal voter [b]y U.S. law . . . I am allowed to leave my house when I want."  Nevertheless, the BOE granted the challenge to his registration and purported to invalidate his vote in the Special Election.   The BOE's Notice of Determination justified this action on the ground that he is a "[s]tudent residing at 137 Main Street" and the "address of parental home in Brooklyn on driver's license."  In the February Determination, the BOE cancelled Isaac Kohn's registration without explanation.

X.      Plaintiff Yaacov M. Sebbag voted by affidavit in the Special Election and submitted a completed Questionnaire to the BOE.  In response to the challenge, Mr. Sebbag wrote, "it has nothing to do with me, it is all general" and further asserted, "[I've] been living here for about 3 months.  I don't know why my vote is challenged every time I'm voting.  I'm outraged that my fundamental [right] to vote is consistently questioned on nothing real without any bases [sic]."  Nevertheless, the BOE granted the challenge to his registration and purported to invalidate his vote in the Special Election.  The BOE based its denial of Yaacov Sebbag's registration in part on the fact that he submitted the questionnaire on November 5, 2014, after the deadline, and that he was a student residing at 137 Main Street.  In the February Determination, the BOE canceled his registration without explanation.

Y.      Plaintiff Borech Stein voted by affidavit in the Special Election and submitted a completed Questionnaire. Officer Eric Chaboty investigated his residence at 10 Hickory Court, Apt. A, on or around October 8, 2014.  Officer Chaboty interviewed Borech Stein's son, Naftula Stein, who advised Officer Chaboty that Borech and his wife were not home.  Officer Chaboty determined the residence was physically capable of occupancy and that Borech Stein had resided there since April 2014.  Nevertheless, the BOE granted the challenge to his registration and purported to invalidate his vote in the Special Election.   The BOE based its cancellation of Borech Stein's vote on the unsubstantiated opinion that the signatures on licenses, questionnaires, and voter registrations did not match.  In the February Determination, the BOE cancelled Borech Stein's registration without explanation.

Z.      Plaintiff Scheindel Stein voted by affidavit in the Special Election and submitted to the BOE a completed Questionnaire.  Officer Eric Chaboty investigated her residency at 10 Hickory Court, Apt. A, on or around October 8, 2014.  Officer Chaboty interviewed her son, Naftula Stein, who advised the officer that Scheindel and her husband were not home.  Officer Chaboty determined the residence was physically capable of occupancy and that Scheindel Stein resided there since April 2014.  Nevertheless, the BOE granted the challenge to her registration and purported to invalidate her vote.  The BOE based its cancellation of her vote on the unsubstantiated determination that the signatures on licenses, questionnaires, and voter registrations do not match.  In the February Determination, the BOE cancelled her registration without explanation.

AA.     Plaintiff Joseph S. Wasserman voted by affidavit in the Special Election and submitted a completed Questionnaire to the BOE.  In response to the challenge, Joseph Wasserman wrote, "[due] to my pending divorce, I do not reside with my wife and children . . . my only permanent residence is at 101 Main Street, Bloomingburg New York."  The Sheriff later confirmed Joseph Wasserman resided at 101 Main Street. Nevertheless, the BOE granted the challenge to Joseph Wasserman's registration and purported to invalidate Joseph Wasserman's vote in the Special Election.  The BOE justified its cancellation of Joseph Wasserman's vote with the following statement: "Divorce pending/residing in basement apartment.  Ken Nakdimen's nephew.  No documentation provided."  In the February Determination, the BOE cancelled Joseph Wasserman's registration without explanation.

99.     For each of these voters, the overwhelming weight of the evidence demonstrates that he or she remains qualified to vote in the Village of Bloomingburg.  This evidence includes statements and affirmations submitted by Plaintiffs verifying: Their intention to remain resident in the Village of Bloomingburg; their history of voting in the Village of Bloomingburg; their signing of affidavit ballot envelopes verifying, under penalty of perjury, that they reside in the Village of Bloomingburg; their voting in Bloomingburg during the November general election; their submission of voter questionnaires and address confirmation cards verifying their Bloomingburg residence; their submission of lease agreements, bills, invoices, and other documents reflecting their residence in the Village of Bloomingburg; and their submission of New York Driver License and registration documents evidencing their residence in the Village of Bloomingburg.

100.    No board of elections anywhere in the United States may force registered voters to justify their existing registration through the submission of such a wealth of evidence. For the BOE then to proceed to try to nullify these registrations on multiple occasions is unconscionable. Worse, the Board of Elections cancelled the registrations of voters who, among other things:

- Registered to vote with the BOE, which is entitled to presumption of validity.

- Appeared in person at their polling place and affirmed, subject to penalty of law, that they were properly registered to vote in the village election.

- Responded to the post-registration challenge questionnaires that were sent to them by the BOE, again affirming the veracity of their responses.

- Talked in person to the Sullivan County Sheriff to prove their residency.

- Appeared in person at the polls during a general election.

- Provided additional information evidencing their continued residency by either appearing in person before the BOE or by submitting affirmations and other documentation of residence, such as utility bills.

101.    Not content with twice cancelling the voter registrations, the Board recently took yet another measure to create more pretextual justifications for cancelling still more votes. On February 27, 2015, the Board sent voter Confirmation Cards—reserved by the Election Law for voters who change addresses—to Hasidic Jewish voters throughout Bloomingburg. N.Y. Elec. § 5-712. Confirmation cards are sent to voters who change their addresses through the National Change of Address System or notify the Board of Election of changes of address. If a confirmation card is returned to the Board of Elections as undeliverable, the voter may be required to vote by affidavit ballot and if the voter does not vote in the next two federal elections, the voter's registration may be cancelled. New York Election Law prohibits the sending of confirmation notices between June and November and within the 90 days before any spring primary election. The BOE will no doubt rely on those cards, sent in the midst of winter storms,

42

as a justification for moving Hasidic Voters to an inactive status, and potentially seeking to cancel their voter registration, for yet a third time.

102.    In addition, Plaintiffs have just received a new round of voter registration challenges filed by individuals affiliated with the RCC.  Those challenges, apparently filed with the BOE on March 2, 2015, take aim at the handful of Hasidic Jewish voters whom the BOE permitted to remain on the voting rolls.  This ensures that absent action by this Court, these unconstitutional and outrageous challenges will only continue.

## CLASS ACTION ALLEGATIONS

103.    Plaintiffs also bring this lawsuit as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of a class of Hasidic Jewish voters who are eligible to register to vote in the Village of Bloomingburg and whose votes or voter registrations have annulled or cancelled, or have been purported to be annulled or cancelled, by the BOE.

104.    Numerosity:  The Class is so numerous that joinder of all members is impractical. The precise number of members in the Class and their identities are unknown to Plaintiffs at this time because the Board continues to aggressively investigate baseless objections to Hasidic Jewish voter registrations and cancel Hasidic Jewish voter registrations.

105.    Commonality:  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.

106.    Typicality:    Plaintiffs' claims are typical of the claims of other members of the Class.  Plaintiffs have all been subject to discriminatory and arbitrary enforcement of the state election laws and to unconstitutional burdens on their right to vote.  Plaintiffs' claims are based on the same legal theories as the claims of other members of the Class.

107.    Adequacy:    Plaintiffs will fairly and adequately protect the interests of all members of the Class in the prosecution of this action and have no conflicting interests with the

43

Class.  Plaintiffs are similarly situated with, and have similar injuries to, the members of the Class they seek to represent.  Plaintiffs are adults and have retained counsel experienced in complex class action matters.

108.  <u>Superiority</u>:  A class action is superior to all other available methods for the fair and efficient adjudication of this case, because joinder of all members is impractical.  Class treatment is especially appropriate in this case because Defendants have intimidated and penalized members of the Class for voting.  Thus, individual members of the Class may be unable or unwilling to risk further retaliation by seeking individually to vindicate their rights.  The class action device presents few, if any, management difficulties in this case and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of this action will ensure that all claims of members of the Class are before this Court for consistent adjudication.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION
**"Equal Protection – Religious Discrimination"**
**U.S. Constitution, Fourteenth Amendment, Equal Protection**
**42 U.S.C. § 1983**

**(Against All Defendants)**

109.  Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

110.  The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."

111.  Defendants, acting in their official government capacity, intentionally and purposefully discriminated against and continue to discriminate against Plaintiffs on the basis of

44

their religion: (1) by discriminating against and targeting Plaintiffs; (2) by prohibiting Plaintiffs from voting in Village elections; and (3) by treating Hasidic Jewish voters, including Plaintiffs, on less equal terms than non-Hasidic Jewish voters. Defendants' disparate treatment was intentional.

112. Defendants have discriminated against Plaintiffs on the basis of their religious views in numerous ways, including without limitation:

A. Entertaining frivolous challenges to Hasidic Jewish voters that were plainly submitted by citizens with the agenda of depriving individuals with Hasidic Jewish names of the right to vote on the basis of religion.

B. Responding to those challenges by requiring Hasidic Jewish voters, including Plaintiffs, to answer extensive and burdensome questionnaires not required or sanctioned by the Election Law, and that on information and belief, have never been used in connection with any other voter registration challenge in Sullivan County or anywhere else, and were purposefully and deliberately used against Plaintiffs to make it more difficult for Hasidic Jewish voters to verify their voter registration.

C. Selectively and arbitrarily relying upon the Sheriff's reports to justify cancellation when the Sheriff found the evidence of residency inconclusive but to ignore the probative value of the Sheriff's findings where he had confirmed that the Hasidic Jewish voters reside in Bloomingburg.

D. Retroactively annulling the votes of Hasidic Jewish voters in clear and blatant disregard of New York Election Law.

E. Placing exceptional burdens on Hasidic Jews to prove their residency, including requiring corroborating evidence beyond a sworn statement of residency.

45

F.      Completely ignoring evidence that Plaintiffs submitted to confirm their registrations in Bloomingburg, relying instead upon irrelevant facts in an effort to cancel these registrations in November 2014, and then arbitrarily and without reasoned explanation cancelling these registrations in February 2015.

G.      Conducting sham and perfunctory investigations and hearings purporting to determine eligibility to vote that, upon information and belief, were conducted in bad faith with the intent of granting the challenges to Hasidic Jewish voters' registration regardless of evidence presented.

113.    Defendants' actions were not motivated by and did not serve any legitimate, rational, or compelling government interest, but were motivated by and resulted in discrimination against Plaintiffs because they are Hasidic Jews.

**AS AND FOR A SECOND CAUSE OF ACTION**
**"Equal Protection – Denial of the Right to Vote"**
**U.S. Constitution, Fourteenth Amendment, Equal Protection**
**42 U.S.C. § 1983**

**(Against All Defendants)**

114.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

115.    The denial or dilution of the right to vote implicates equal protection concerns, as "the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

116.    Defendants, acting in their official government capacity, intentionally and purposefully discriminated against Plaintiffs on the basis of their religion by depriving Plaintiffs of their rights to have their vote count equally as to other individuals: (1) by substantially

46

burdening Plaintiffs' right to vote without a compelling government interest; (2) by discriminating against and targeting Plaintiffs; (3) by prohibiting Plaintiffs from voting in Village elections; and (4) by treating Hasidic Jewish voters, including Plaintiffs, on less equal terms than non-Hasidic Jewish voters. Defendants' disparate treatment of Plaintiffs was not and is not merely incompetent or negligent.

117.    Defendants have discriminated against Plaintiffs by depriving Plaintiffs of their rights to vote in numerous ways, including without limitation:

    A.    Entertaining frivolous challenges to Hasidic Jewish voters that were plainly submitted by citizens with the agenda of depriving individuals with Hasidic Jewish names of the right to vote on the basis of religion.

    B.    Responding to those challenges by requiring Hasidic Jewish voters, including Plaintiffs, to answer extensive and burdensome questionnaires not required or sanctioned by the Election Law, and that on information and belief, have never been used in connection with any other voter registration challenge in Sullivan County or anywhere else, and were purposefully and deliberately used with Plaintiffs to make it more difficult for Hasidic Jewish voters to prove that their voter registration was correct.

    C.    Selectively and arbitrarily relying upon the Sheriff's report to justify cancellation when the Sheriff found the evidence of residency inconclusive but to ignore the probative value of the Sheriff's findings where he had confirmed that the Hasidic Jewish voters reside in Bloomingburg.

    D.    Retroactively annulling the votes of Hasidic Jewish voters in clear and blatant disregard of New York Election Law.

    E.        Placing exceptional burdens on Hasidic Jews to prove their residency, including requiring corroborating evidence beyond a sworn statement of residency.

    F.        Completely ignoring evidence that Plaintiffs submitted to confirm their registrations in Bloomingburg, relying instead upon irrelevant facts in an effort to cancel these registrations in November 2014, and then arbitrarily and without reasoned explanation cancelling these registrations in February 2015.

    G.        Conducting sham and perfunctory investigations and hearings purporting to determine eligibility to vote that, upon information and belief, were conducted in bad faith with the intent of granting the challenges to Hasidic Jewish voters' registration regardless of evidence presented.

118.    Defendants' actions were not motivated by and did not serve any legitimate, rational, or compelling government interest, but were motivated by and resulted in discrimination against Plaintiffs because they are Hasidic Jews.

119.    Defendants' disparate treatment of Plaintiffs, because they are Hasidic Jewish voters, has resulted in an erroneous deprivation of Plaintiffs' constitutionally protected right to vote.

**AS AND FOR A THIRD CAUSE OF ACTION**
**"Due Process – Right to Vote"**
**U.S. Constitution, Fourteenth Amendment, Due Process**
**42 U.S.C. § 1983**

**(Against All Defendants)**

120.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

121.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides, in pertinent part, that no state shall "deprive any person of life, liberty, or

property, without due process of the law." The right to vote has long been recognized as a fundamental, constitutionally protected right that is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

122.    Defendants' actions violated and continue to violate due process by depriving Plaintiff of their constitutionally protected right to vote because Plaintiffs are Hasidic Jews.

123.    Defendants, acting in their official government capacity, intentionally and purposefully annulled Plaintiffs' votes and disenfranchised Plaintiffs because they are Hasidic Jews. Defendants denied Plaintiffs due process by, among other things:

      A.    Entertaining frivolous challenges to Hasidic Jewish voters that were plainly submitted by citizens with the agenda of depriving individuals with Hasidic Jewish names of the right to vote on the basis of religion.

      B.    Responding to those challenges by requiring Hasidic Jewish voters, including Plaintiffs, to answer extensive and burdensome questionnaires that were not required or sanctioned by the Election Law, and on information and belief, have never been used in connection with any other voter registration challenge in Sullivan County or anywhere else, and were purposefully and deliberately used with Plaintiffs to make it more difficult for Hasidic Jewish voters to prove that their voter registration was correct.

      C.    Selectively and arbitrarily relying upon the Sheriff's reports to justify cancellation when the Sheriff found the evidence of residency inconclusive but to ignore the probative value of the Sheriff's findings where he had confirmed that the Hasidic Jewish voters reside in Bloomingburg.

      D.    Retroactively annulling votes of Hasidic Jewish voters in clear and blatant disregard of New York Election Law.

      E.      Placing exceptional burdens on Hasidic Jews to prove their residency, including requiring corroborating evidence beyond a sworn statement of residency.

      F.      Completely ignoring evidence that Plaintiffs submitted to confirm their registrations in Bloomingburg, relying instead upon irrelevant facts in an effort to cancel these registrations in November 2014, and then arbitrarily and without reasoned explanation cancelling these registrations in February 2015.

      G.      Conducting sham and perfunctory investigations and hearings purporting to determine eligibility to vote that, upon information and belief, were conducted in bad faith with the intent of granting the challenges to Hasidic Jewish voters' registration regardless of evidence presented.

124.     Defendants' actions and determinations were and are designed to prevent Hasidic Jewish voters from voting in Village elections to support the candidates and referendums of the their choice, including candidates and referendums that would support the completion of both Chestnut Ridge, a religious school for Hasidic Jewish children, and a mikvah to serve the religious needs of Hasidic Jewish women.

125.     Defendants' actions were not motivated by and did not serve any legitimate, rational, or compelling government interest, but were motivated by and resulted in discrimination against Plaintiffs because they are Hasidic Jews.

126.     Defendants' actions risked erroneously depriving Plaintiffs of their constitutionally protected right to vote, and, in fact, did erroneously deprive Plaintiffs of their constitutionally protected right to vote.

## AS AND FOR A FOURTH CAUSE OF ACTION
### "Due Process – Arbitrary"
### U.S. Constitution, Fourteenth Amendment, Due Process
### 42 U.S.C. § 1983

### (Against All Defendants)

127.   Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

128.   The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides, in pertinent part, that no state shall "deprive any person of life, liberty or property, without due process of law."

129.   Defendants, acting in their official government capacity, intentionally and purposefully acted in ways that were capricious and arbitrary so as to deny Plaintiffs due process by, among other things:

A.   Entertaining frivolous challenges to Hasidic Jewish voters that were plainly submitted by citizens with the agenda of depriving individuals with Hasidic Jewish names of the right to vote on the basis of religion.

B.   Responding to those challenges by requiring Hasidic Jewish voters, including Plaintiffs, to answer extensive and burdensome questionnaires not required or sanctioned by the Election Law, and that on information and belief, have never been used in connection with any other voter registration challenge in Sullivan County or anywhere else, and were purposefully and deliberately used against Plaintiffs to make it more difficult for Hasidic Jewish voters to verify their voter registration.

C.   Selectively and arbitrarily relying upon the Sheriff's reports to justify cancellation when the Sheriff found the evidence of residency inconclusive but to ignore

the probative value of the Sheriff's findings where he had confirmed that the Hasidic Jewish voters reside in Bloomingburg.

       D.     Retroactively annulling the votes of Hasidic Jewish voters in clear and blatant disregard of New York Election Law.

       E.     Placing exceptional burdens on Hasidic Jews to prove their residency, including requiring corroborating evidence beyond a sworn statement of residency.

       F.     Completely ignoring evidence that Plaintiffs submitted to confirm their registrations in Bloomingburg, relying instead upon irrelevant facts in an effort to cancel these registrations in November 2014, and then arbitrarily and without reasoned explanation cancelling these registrations in February 2015.

       G.     Conducting sham and perfunctory investigations and hearings purporting to determine eligibility to vote that, upon information and belief, were conducted in bad faith with the intent of granting the challenges to Hasidic Jewish voters' registration regardless of evidence presented.

130.    Defendants failed to comply with ordinary and regular procedures, entered arbitrary determinations contrary to the weight of evidence, and failed to provide any reasoned basis for such actions. Those actions had the effect of depriving Plaintiffs of a protected interest in their right to vote without due process.

131.    The arbitrary nature of Defendants is demonstrated by their repeated violations of New York State Election Law.

132.    Defendants' asserted rationales for their actions—investigating Hasidic Jewish voters based on frivolous objections, purporting to retroactively annul votes cast by Hasidic Jews, and cancelling voter registrations of Hasidic Jews—do not provide a valid, rational, or

compelling basis for Defendants' actions and determinations.   In fact, the BOE's February Determination is not supported by any rationale, explanation, or justification at all.

133.   Defendants' actions were not motivated by and did not serve any legitimate, rational, or compelling government interest, but were motivated by and resulted in arbitrary discrimination against Plaintiffs because they are Hasidic Jews.

134.   Defendants' actions erroneously deprived Plaintiffs of their constitutionally protected right to vote, and, in fact, did erroneously deprive Plaintiffs of their constitutionally protected right to vote.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**"First Amendment – Religious Freedom"**
**U.S. Constitution, First and Fourteenth Amendment**
**42 U.S.C. § 1983**

**(Against All Defendants)**

135.   Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

136.   The First Amendment prohibits states from imposing burdens on individuals based upon their religious views or status, *see United States v. Ballard*, 322 U.S. 78 (1944), and prohibits government action that "discriminates against some or all religious belief or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993).

137.   Defendants, acting in their official government capacity, intentionally and purposefully deprived and continue to deprive Plaintiffs of their rights to free exercise of religion: (1) by substantially burdening Plaintiffs' religious exercise without a compelling government interest; (2) by discriminating against and targeting Plaintiffs; (3) by prohibiting Plaintiffs from voting in Village elections; and (4) by treating Hasidic Jewish voters, including

53

Plaintiffs, on less equal terms than non-Hasidic Jewish voters.   Defendants' treatment of Plaintiffs was not and is not merely incompetent or negligent.

138.   Defendants' actions and determinations were and are designed to prevent Hasidic Jewish voters from voting in Village elections to support the candidates and referendums of the their choice, including candidates and referendums that would support the completion of both Chestnut Ridge, a religious school for Hasidic Jewish children, and a mikvah to serve the religious needs of Hasidic Jewish women.

139.   Defendants' actions were not motivated by and did not serve any legitimate, rational, or compelling government interest, but were motivated by and resulted in discrimination against Plaintiffs because they are Hasidic Jews.

140.   Defendants' actions have resulted in a deprivation of Plaintiffs' constitutionally protected right to free exercise of religion.

## AS AND FOR A SIXTH CAUSE OF ACTION
### "First Amendment - Freedom of Association, Right to Vote"
### U.S. Constitution, First and Fourteenth Amendment
### 42 U.S.C. § 1983

### (Against All Defendants)

141.   Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

142.   The First Amendment protects the freedom to join together to further common political beliefs, which "presupposes the freedom to identify those who constitute the association, and to limit the association to those people." *Democratic Party of United States v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 122 (2000).  "The right to vote derives from the right of association that is at the core of the First Amendment, protected from state infringement by the Fourteenth Amendment." *Storer v. Brown*, 415 U.S. 724, 756 (1974).

143.    Defendants, acting in their official government capacity, intentionally and purposefully deprived and continue to deprive Plaintiffs of their rights to vote: (1) by substantially burdening Plaintiffs' rights to vote without a compelling government interest; (2) by discriminating against and targeting Plaintiffs; (3) by prohibiting Plaintiffs from voting in Village elections; and (4) by treating Hasidic Jewish voters, including Plaintiffs, on less equal terms than non-Hasidic Jewish voters.  Defendants' treatment of Plaintiffs was not and is not merely incompetent or negligent.

144.    Defendants have deprived Plaintiffs of their First Amendment rights to vote in numerous ways, including without limitation:

A.    Entertaining frivolous challenges to Hasidic Jewish voters that were plainly submitted by citizens with the agenda of depriving individuals with Hasidic Jewish names of the right to vote on the basis of religion.

B.    Responding to those challenges by requiring Hasidic Jewish voters, including Plaintiffs, to answer extensive and burdensome questionnaires not required or sanctioned by the Election Law, and that on information and belief, have never been used in connection with any other voter registration challenge in Sullivan County or anywhere else, and were purposefully and deliberately used against Plaintiffs to make it more difficult for Hasidic Jewish voters to verify their voter registration.

C.    Selectively and arbitrarily relying upon the Sheriff's reports to justify cancellation when the Sheriff found the evidence of residency inconclusive but to ignore the probative value of the Sheriff's findings where he had confirmed that the Hasidic Jewish voters reside in Bloomingburg.

    D.     Retroactively annulling the votes of Hasidic Jewish voters in clear and blatant disregard of New York Election Law.

    E.     Placing exceptional burdens on Hasidic Jews to prove their residency, including requiring corroborating evidence beyond a sworn statement of residency.

    F.     Completely ignoring evidence that Plaintiffs submitted to confirm their registrations in Bloomingburg, relying instead upon irrelevant facts in an effort to cancel these registrations in November 2014, and then arbitrarily and without reasoned explanation cancelling these registrations in February 2015.

    G.     Conducting sham and perfunctory investigations and hearings purporting to determine eligibility to vote that, upon information and belief, were conducted in bad faith with the intent of granting the challenges to Hasidic Jewish voters' registration regardless of evidence presented.

145.    Defendants' actions were not motivated by and did not serve any legitimate, rational, or compelling government interest, but were motivated by and resulted in discrimination against Plaintiffs because they are Hasidic Jews.

146.    Defendants' actions erroneously deprived Plaintiffs, because they are Hasidic Jews, of their constitutionally protected rights to vote.

### AS AND FOR A SEVENTH CAUSE OF ACTION
#### "First Amendment - Freedom of Association"
#### U.S. Constitution, First and Fourteenth Amendment
#### 42 U.S.C. § 1983

#### (Against All Defendants)

147.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

148.    The First Amendment protects the freedom to join together to further common political beliefs, which "presupposes the freedom to identify those who constitute the association, and the limit the association to those people." *Democratic Party of United States v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 122 (2000). "[I]mplicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

149.    Defendants, acting in their official government capacity, intentionally and purposefully deprived and continue to deprive Plaintiffs of their rights to freedom of association: (1) by substantially burdening Plaintiffs' rights to vote without a compelling government interest; (2) by discriminating against and targeting Plaintiffs; (3) by prohibiting Plaintiffs from voting in Village elections; and (4) by treating Hasidic Jewish voters, including Plaintiffs, on less equal terms than non-Hasidic Jewish voters.  Those actions have limited, impaired, and seriously handicapped Plaintiffs' ability to associate with others in order to pursue shared political, social, educational, religious, and cultural goals.  Defendants' actions have essentially cut off the Hasidic Jewish community in Sullivan County, including Plaintiffs, from participating in local politics, severely limiting the opportunities of the Hasidic Jewish community, and Plaintiffs, for political representation regarding physical, social, religious, and cultural developments in Sullivan County.

150.    Defendants' actions and determinations were and are designed to prevent Hasidic Jewish voters from voting in Village elections to support the candidates and referendums of the their choice, including candidates and referendums that would support the completion of both

Chestnut Ridge, a religious school for Hasidic Jewish children, and a mikvah to serve the religious needs of Hasidic Jewish women.

151.   Defendants' asserted rationales for their actions—investigating Hasidic Jewish voters based on facially unmeritorious objections, purporting to retroactively annul votes cast by Hasidic Jews, and cancelling voter registrations of Hasidic Jews—do not provide a valid, rational, or compelling basis for Defendants' actions and determinations.  In fact, the BOE's February Determination is not supported by any rationale, explanation, or justification at all.

152.   Defendants' actions were not motivated by and did not serve any legitimate, rational, or compelling government interest, but were motivated by and resulted in discrimination against Plaintiffs because they are Hasidic Jews.

153.   Defendants' actions erroneously deprived Plaintiffs, because they are Hasidic Jews, of their constitutionally protected rights to associate with others in pursuit of political, social, religious, and cultural ends.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### "Denial of Right to Vote"
### Voting Rights Act of 1965
### 52 U.S.C.A. § 10307(a)

### (Against All Defendants)

154.   Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

155.   The Voting Rights Act of 1965 provides, "[n]o person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote . . . or willfully fail or refuse to tabulate, count, and report such person's vote."  52 U.S.C.A. § 10307(a).

156.    Defendants, acting under color of law, intentionally and purposefully limited, abridged, and denied Plaintiffs, because they are Hasidic Jews, the right to vote and refused to tabulate, count or report Plaintiffs' votes.

157.    Defendants acted in violation of the Voting Rights Act by, among other things:

A.    Entertaining frivolous challenges to Hasidic Jewish voters that were plainly submitted by citizens with the agenda of depriving individuals with Hasidic Jewish names of the right to vote on the basis of religion.

B.    Responding to those challenges by requiring Hasidic Jewish voters, including Plaintiffs, to answer extensive and burdensome questionnaires not required or sanctioned by the Election Law, and that on information and belief, have never been used in connection with any other voter registration challenge in Sullivan County or anywhere else, and were purposefully and deliberately used against Plaintiffs to make it more difficult for Hasidic Jewish voters to verify their voter registration.

C.    Selectively and arbitrarily relying upon the Sheriff's reports to justify cancellation when the Sheriff found the evidence of residency inconclusive but to ignore the probative value of the Sheriff's findings where he had confirmed that the Hasidic Jewish voters reside in Bloomingburg.

D.    Retroactively annulling the votes of Hasidic Jewish voters in clear and blatant disregard of New York Election Law.

E.    Placing exceptional burdens on Hasidic Jews to prove their residency, including requiring corroborating evidence beyond a sworn statement of residency.

F.    Completely ignoring evidence that Plaintiffs submitted to confirm their registrations in Bloomingburg, relying instead upon irrelevant facts in an effort to cancel

these registrations in November 2014, and then arbitrarily and without reasoned explanation cancelling these registrations in February 2015.

       G.    Conducting sham and perfunctory investigations and hearings purporting to determine eligibility to vote that, upon information and belief, were conducted in bad faith with the intent of granting the challenges to Hasidic Jewish voters' registration regardless of evidence presented.

158.    Defendants' actions and determinations were and are designed to prevent Hasidic Jewish voters from voting in Village elections to support the candidates and referendums of the their choice, including candidates and referendums that would support the completion of both Chestnut Ridge, a religious school for Hasidic Jewish children, and a mikvah to serve the religious needs of Hasidic Jewish women.

159.    Defendants' actions were not motivated by and did not serve any legitimate, rational, or compelling government interest, but were motivated by and resulted in discrimination against Plaintiffs because they are Hasidic Jews.

160.    Defendants' actions have limited, discouraged, and deprived Plaintiffs from exercising their constitutionally protected right to vote.  Indeed, Defendants have erroneously deprived Plaintiffs, because they are Hasidic Jews, of their constitutionally protected rights to vote.

### AS AND FOR A NINTH CAUSE OF ACTION
### "Intimidation, Threatening, or Coercion"
### Voting Rights Act of 1965
### 52 U.S.C.A. § 10307(b)

### (Against All Defendants)

161.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

162.    The Voting Rights Act of 1965 provides "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote . . . ." 52 U.S.C. § 10307(b).

163.    Defendants, acting in their official government capacity, intentionally and purposefully have intimidated, threatened, and coerced Plaintiffs, because they are Hasidic Jews, for voting.

164.    Defendants acted in violation of the Voting Rights Act by, among other things:

A.    Entertaining frivolous challenges to Hasidic Jewish voters that were plainly submitted by citizens with the agenda of depriving individuals with Hasidic Jewish names of the right to vote on the basis of religion.

B.    Responding to those challenges by requiring Hasidic Jewish voters, including Plaintiffs, to answer extensive and burdensome questionnaires not required or sanctioned by the Election Law, and that on information and belief, have never been used in connection with any other voter registration challenge in Sullivan County or anywhere else, and were purposefully and deliberately used against Plaintiffs to make it more difficult for Hasidic Jewish voters to verify their voter registration.

C.    Selectively and arbitrarily relying upon the Sheriff's reports to justify cancellation when the Sheriff found the evidence of residency inconclusive but to ignore the probative value of the Sheriff's findings where he had confirmed that the Hasidic Jewish voters reside in Bloomingburg.

D.    Retroactively annulling the votes of Hasidic Jewish voters in clear and blatant disregard of New York Election Law.

E.    Placing exceptional burdens on Hasidic Jews to prove their residency, including requiring corroborating evidence beyond a sworn statement of residency.

F.    Completely ignoring evidence that Plaintiffs submitted to confirm their registrations in Bloomingburg, relying instead upon irrelevant facts in an effort to cancel these registrations in November 2014, and then arbitrarily and without reasoned explanation cancelling these registrations in February 2015.

G.    Conducting sham and perfunctory investigations and hearings purporting to determine eligibility to vote that, upon information and belief, were conducted in bad faith with the intent of granting the challenges to Hasidic Jewish voters' registration regardless of evidence presented.

165.    Defendants' actions and determinations were and are designed to prevent Hasidic Jewish voters from voting in Village elections to support the candidates and referendums of the their choice, including candidates and referendums that would support the completion of both Chestnut Ridge, a religious school for Hasidic Jewish children, and a mikvah to serve the religious needs of Hasidic Jewish women.

166.    Defendants' actions were not motivated by and did not serve any legitimate, rational, or compelling government interest, but were motivated by and resulted in discrimination against Plaintiffs because they are Hasidic Jews.

167.    Defendants' actions erroneously deprived Plaintiffs, because they are Hasidic Jews, of their constitutionally protected rights to vote, and therefore their rights to participate in the political process in Sullivan County and to election representatives of their choice.

## AS AND FOR A TENTH CAUSE OF ACTION
### "Prohibitions and Limitations on Voting Rights"
### Voting Rights Act of 1965
### 52 U.S.C.A. § 10301

### (Against All Defendants)

168.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

169.    The Voting Rights Act of 1965 prohibits any state limitation on the right to vote "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."   52 U.S.C.A. § 10301(a).    This Court has interpreted this prohibition to extend to the denial of abridgement of the right to vote based on association or membership in Hasidic Jewish community.   *See LeBlanc-Sternberg v. Fletcher*, 781 F. Supp. 261, 272 (S.D.N.Y. 1991).

170.    Defendants, acting in their official government capacity, intentionally and purposefully limited, abridged, and denied Plaintiffs, because they are Hasidic Jews, the right to vote based on association and membership in the Hasidic Jewish community.

171.    Defendants acted in violation of the Voting Rights Act by, among other things:

A.    Entertaining frivolous challenges to Hasidic Jewish voters that were plainly submitted by citizens with the agenda of depriving individuals with Hasidic Jewish names of the right to vote on the basis of religion.

B.    Responding to those challenges by requiring Hasidic Jewish voters, including Plaintiffs, to answer extensive and burdensome questionnaires not required or sanctioned by the Election Law, and that on information and belief, have never been used in connection with any other voter registration challenge in Sullivan County or anywhere

else, and were purposefully and deliberately used against Plaintiffs to make it more difficult for Hasidic Jewish voters to verify their voter registration.

C.      Selectively and arbitrarily relying upon the Sheriff's reports to justify cancellation when the Sheriff found the evidence of residency inconclusive but to ignore the probative value of the Sheriff's findings where he had confirmed that the Hasidic Jewish voters reside in Bloomingburg.

D.      Retroactively annulling the votes of Hasidic Jewish voters in clear and blatant disregard of New York Election Law.

E.      Placing exceptional burdens on Hasidic Jews to prove their residency, including requiring corroborating evidence beyond a sworn statement of residency.

F.      Completely ignoring evidence that Plaintiffs submitted to confirm their registrations in Bloomingburg, relying instead upon irrelevant facts in an effort to cancel these registrations in November 2014, and then arbitrarily and without reasoned explanation cancelling these registrations in February 2015.

G.      Conducting sham and perfunctory investigations and hearings purporting to determine eligibility to vote that, upon information and belief, were conducted in bad faith with the intent of granting the challenges to Hasidic Jewish voters' registration regardless of evidence presented.

172.    Defendants' actions were and are designed to prevent Hasidic Jewish voters from voting in Village elections for candidates and on referenda, including for candidates that would support the completion of both Chestnut Ridge, a religious school for Hasidic Jewish children, and a mikvah to serve the religious needs of Hasidic Jewish women.

173.    Defendants' actions were not motivated by and did not serve any legitimate, rational, or compelling government interest, but were motivated by and resulted in discrimination against Plaintiffs because they are Hasidic Jews.

174.    Defendants' actions erroneously deprived Plaintiffs, because they are Hasidic Jews, of their constitutionally protected rights to vote, and therefore their rights to participate in the political process in Sullivan County and to election representatives of their choice.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

(1)    Certifying this action as a Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiffs as class representatives and their counsel as Class Counsel;

(2)    Awarding Plaintiffs and the Class compensatory damages in an amount to be determined for the deprivation of Plaintiffs' constitutional rights, the economic injury caused by Defendants' unlawful conduct, and expenses occurred by Plaintiffs and caused by Defendants' actions in an amount to be determined at trial;

(3)    Awarding Plaintiffs and the Class punitive damages;

(4)    Enjoining Defendants, their officers, agents, employees, and attorneys from the discriminatory enforcement of the election laws and from seeking to prohibit Plaintiffs and the Class from voting in elections; from annulling votes cast by Plaintiffs and the Class; and from disenfranchising Plaintiffs and the Class;

(5)    Awarding Plaintiffs the costs, disbursements, and attorneys' fees incurred in connection with this action pursuant to 42 U.S.C. § 1988; and

(6)     Awarding Plaintiffs and the Class such other and further relief as this Court

deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. Pro. 38, Plaintiffs demands a jury on all issues so triable.

Dated: March 9, 2015                    DECHERT LLP
       New York, New York

                                  By:    _____
                                         Steven A. Engel
                                         Michael H. Park
                                         Jamie R. Hacker
                                         1095 Avenue of the Americas
                                         New York, New York 10036
                                         (212) 698-3500
                                         (212) 698-3599 (facsimile)
                                         steven.engel@dechert.com

                                         Lily A. North (*pro hac vice pending*)
                                         One Bush Street, Suite 1600
                                         San Francisco, California 94104
                                         (415) 262-4500
                                         (415) 262-4555 (facsimile)
                                         *Attorneys for Plaintiffs*